THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY McCRAY,              )
                             )
              Plaintiff,     )
                             )    No. 19 C 6597
        v.                   )
                             )    Judge Virginia M. Kendall
OMNISPEECH, LLC,             )
                             )
              Defendant.     )

## MEMORANDUM OPINION & ORDER

Plaintiff Gregory McCray ("Plaintiff") sued Defendant OmniSpeech, LLC ("Defendant" or "OmniSpeech") for breach of contract and account stated. Specifically, McCray alleges that OmniSpeech breached its contract with McCray for the provision of consultancy services, in that OmniSpeech failed to fully pay invoices for services rendered between October 2015 and December 2016. McCray moves for summary judgment on the breach of contract claim, on grounds that no genuine issue of material fact exists regarding OmniSpeech's breach of the contract's terms. For the following reasons, McCray's motion [46] is granted.

## BACKGROUND

### A.     Parties and Contract for Services

Plaintiff McCray is a "professional Chief Executive Officer." (Dkt. 52 ¶¶ 3, 21). Defendant OmniSpeech is a software technology company that develops noise reduction and suppression technology for speech-enabled applications and other devices. (*Id.* ¶ 5; Dkt. 55 ¶ 1). The company depends on investment from outside sources. (Dkt. 52 ¶ 9). OmniSpeech is led by its founder, Carol Espy-Wilson. (Dkt. 55 ¶ 2). Espy-Wilson is a professor of electrical engineering

at the University of Maryland, College Park. (*Id.*). She operates OmniSpeech out of offices on the premises of the University's College Park location. (Dkt. 52 ¶ 8).

Espy-Wilson and McCray first met in October 2015 through a recruiter. (Dkt. 55 ¶ 4). At that time, they discussed the possibility of McCray providing consulting services for OmniSpeech. (*Id.*). McCray told Espy-Wilson that he had a network of fundraising contacts and thought he could assist her in fundraising for OmniSpeech. (Dkt. 55 ¶ 6). Espy-Wilson thereafter decided to hire McCray as a consultant. (Dkt. 52 ¶ 12). She sought his assistance in raising funds, obtaining customers for OmniSpeech's software products, and general management of the company. (*Id.*).

McCray prepared a draft employment contract, referred to as the Consultancy Agreement ("Agreement"), and provided it to Espy-Wilson for review. (Dkt. 52 ¶ 16). Espy-Wilson reviewed the draft agreement and revised it. (Dkt. 52 ¶ 17). Specifically, she clarified the kinds of funds that could be used to pay McCray for his services. (Dkt. 55-1 at 2–3). Espy-Wilson made no further edits to the Agreement. (Dkt. 52 ¶ 18; *see also* Dkt. 55-1 at 2–3 (showing the edits Espy-Wilson made and her reasoning)). All parties signed the contract on October 15, 2015. (Dkt. 52 ¶ 19). The executed Agreement set forth, among other things, that McCray would serve as a consultant to OmniSpeech from October 12, 2015 through December 31, 2015, and that the time frame of the Agreement "may be extended beyond December 31, 2015" by "mutual agreement." (Dkt. 48-1). The draft Agreement also stated: "OmniSpeech agrees that McCray will charge [OmniSpeech] a rate of $1,500 per day" and that McCray will work two days a week unless the parties agree to increase or decrease this number. (*Id.*). It further required McCray to "provide invoices to OmniSpeech at the end of each month." (*Id.*). Finally, the contract required OmniSpeech to "fully pay [McCray] once the Company has received funding of more than $100,000" from specific funding streams. (*Id.*).

McCray began his work for OmniSpeech in October of 2015 pursuant to the Agreement. (Dkt. 52 ¶ 20). Throughout his time at OmniSpeech, McCray worked to obtain investors for the company and to market its product, which sometimes required him to travel. (*Id.* ¶¶ 21–22). McCray also drafted and modified contracts; prepared presentations; prepared and modified market and product analysis models; and participated in – and often ran – investor and customer meetings, "many of which were in Asia such that he would have to do this work at odd hours of the night." (*Id.* ¶ 23; *see also* Dkt. 55-2 (showing McCray's invoices submitted to OmniSpeech with brief descriptions of his daily work, from October 2015 through December 2016)).

**B.    Dispute Concerning McCray's Billing Practices**

McCray provided monthly invoices to OmniSpeech as required by the Agreement. (Dkt. 52 ¶ 25, 28). The invoices also contained a short description of the work he performed on a given day. (*Id.*¶ 29). McCray claims that "every single day billed to OmniSpeech as an OmniSpeech designated day included more than 10 hours of work by McCray for OmniSpeech on that day, and many days were considerably longer." (*Id.* ¶ 26). Although McCray sometimes worked more than two days a week for OmniSpeech, he billed OmniSpeech for only two days per week according to the parties' agreement. (*Id.* ¶¶ 25, 27, 30).

The record shows that OmniSpeech accepted McCray's invoices without complaint or comment from October 2015 to March 2016. (*Id.* ¶¶ 33–34). On March 14, 2016, Espy-Wilson sent McCray an email with respect to the December invoice. (*Id.* ¶ 36). Espy-Wilson explained that she "looked over [McCray's] invoices since we hope to be in a place where we can start paying some more of our bills." (Dkt. 55-4 at 1). She stated that she was "surprised that [McCray] charged the full $1500 for so many days" and expressed doubt that McCray worked "anywhere close to 8 hours" on certain dates (specifically pointing out only one date, December 8, 2015). (Dkt. 52 ¶

36; Dkt. 55-4 at 1). Espy-Wilson also stated, "I need you to prorate your time." (Dkt. 52 ¶ 36). Plaintiff responded to Espy-Wilson's email within two hours. (Dkt. 55-4 at 1). McCray asserted in his reply email that he was "following the Agreement that we signed that was set to a day rate as opposed to an hourly rate." (*Id.*). He also noted that he "usually spent more time on OmniSpeech than [he] recorded," in any event, and confirmed that he "spent the day" working for OmniSpeech on the date in question. (*Id.*). However, he agreed to "significantly" reduce his February invoice to something "very minimal." (*Id.*). McCray did not prorate his time following this exchange. (Dkt. 52 ¶ 40). His invoices for the rest of 2016, from March through December, reflected that he was still billing by the day. (*Id.*; *see also* Dkt. 55-2). OmniSpeech points to no further evidence that it ever again complained about McCray's billing practices (or that it did so prior to Espy-Wilson's March 14, 2016 email, for that matter). (*See, e.g.*, Dkt. 51-2 at 110:12–124:7 (Espy-Wilson admitting in deposition testimony that she has no recollection of disputing any particular invoice aside from when she sent her March 14, 2016 email)).

## C.     Dispute Concerning Payment of Fees

The Agreement required OmniSpeech to commence payments for McCray's services once OmniSpeech brought in $100,000. (Dkt. 52 ¶ 32). OmniSpeech reached that milestone by March of 2016, (*id.*), and so was required to begin payments thereafter per the Agreement. OmniSpeech began providing payments to McCray in April of 2016, and by August of 2016 the company had made 10 payments totaling $22,500. (*Id.* ¶ 47). After August, OmniSpeech ceased paying McCray for his services. (*Id.* ¶ 47).

Between October of 2015 and December of 2016, McCray billed a total of 133 days to OmniSpeech and provided monthly invoices totaling $199,500. (*Id.* ¶ 45). McCray has made demands for payment by OmniSpeech. (*Id.* ¶ 50). McCray seeks a judgment for the outstanding

amount of his invoices, which amounts to $177,000, plus pre- and post-judgment interest. (*Id.* ¶ 54; *see also* Dkt. 55-2 at 1).

## ARGUMENT

### A.  Breach of Contract

"The elements of a claim for breach of contract are (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 1st Dist. 2004)). Here, there is no question that the Agreement was a valid contract. (Dkt. 52 ¶¶ 18–19). McCray evidently performed under the contract by providing consultancy services. (*E.g.*, Dkt. 52 ¶¶ 20, 22; Dkt. 54-2 (showing McCray's monthly invoices dated October 2015 through December 2016 with brief descriptions of his activities)). Furthermore, McCray provided evidence of pecuniary injury he suffered in the event OmniSpeech is deemed to have breached the terms of the Agreement. (Dkt. 54-2 at 1 (showing McCray's invoices amounting to $199,500, and OmniSpeech's total payments of $22,500); *see also* Dkt. 47 at 8;). The question, then, is whether OmniSpeech breached the contract by failing to pay McCray's requested fees.

Under Illinois law, the Court's goal in construing a contract is to effectuate the parties' intent. *Empress Casino Joliet Corp. v. W.E. O'Neil Const. Co.*, 68 N.E.3d 856, 869 (Ill. App. Ct. 1st Dist. 2016) (citing *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011)). *See also Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1077 (N.D. Ill. 2015) (quoting *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 381 (7th Cir. 2001). To achieve this goal, the Court begins with examining the plain language of the contract. *Empress Casino*, 68 N.E.3d at 869 (citing *Thompson*, 241 Ill. 2d at 441). *See also Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992–93 (7th Cir. 2007)

5

(citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999).  If the words in the contract are clear and unambiguous, courts give them their plain, ordinary, and popular meaning. *Empress Casino*, 68 N.E.3d at 869 (citing *Thompson*, 241 Ill. 2d at 441).  *See also Camico Mut. Ins. Co.*, 474 F.3d at 992–93 (explaining that Illinois courts follow the "four corners rule," directing that a written agreement "must be presumed to speak the intention of the parties who signed it") (citations omitted); *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998) ("The terms of an agreement . . . should be generally enforced as they appear, and those terms will control the rights of the parties.") (citations omitted).  Only when the language of the contract is ambiguous – or reasonably susceptible to more than one interpretation – may the Court consider extrinsic evidence to glean the parties' intent.  *Empress Casino*, 68 N.E.3d at 869 (citing *Thompson*, 241 Ill. 2d at 441).  *See also Thompson*, 241 Ill. 2d at 443 ("A court will find ambiguity if the contract language is obscure in meaning through indefiniteness of expression.") (citation and internal quotation marks omitted).  Mere disagreement between the parties concerning a provision's meaning does not render its language ambiguous.  *Empress Casino*, 68 N.E.3d at 869.  Courts "will not add language or matters to a contract about which the instrument is silent, nor add words or terms to the agreement to change the plain meaning, as expressed by the parties."  *Id.* at 870 (citing *Sheehy v. Sheehy*, 702 N.E.2d 200, 204 (Ill. App. Ct. 1st Dist. 1998)).

The relevant portion of the Agreement states:

> *OmniSpeech agrees that McCray will charge the Company a rate of $1,500 per day*.  The expectation will be that Greg [McCray] will provide his services for a minimum of 2 days a week.  The amount of days per week may be increased or reduced with mutual agreement between Greg McCray and OmniSpeech.  Mr. McCray will provide invoices to OmniSpeech at the end of each month.  It is understood that OmniSpeech will fully pay Greg McCray once the Company has received funding of more than $100,000 – whether that is a bridge round, series A round, a loan, a grant (as long as such payment is allowed by the grant), or any combination of whichever type of funding arrives first.  Greg McCray's business expenses will be reimbursed immediately by OmniSpeech upon receipt.

6

(Dkt. 48-1 at 1 (emphasis added)). The parties dispute what was contemplated by "a rate of $1,500 per day." (Dkt. 47 at 11; Dkt. 53 at 7–8). The plain and ordinary meaning of this language is clear. The Agreement simply states that for each day that McCray provided his services to OmniSpeech, OmniSpeech would compensate him $1,500. There is nothing obscure or indefinite about the disputed language, and no other terms in the contract render this payment provision ambiguous.[1] *Thompson*, 241 Ill. 2d at 441, 443. Consequently, McCray is correct that the Defendant agreed to pay him by the day.

OmniSpeech argues that the contract should be read another way. Per OmniSpeech, the agreement anticipated that McCray would bill *by the hour* at a rate of $1,500 per day, and that a day is equal to eight hours. (Dkt. 52 ¶ 51; *cf.* Dkt. 53 at 4, 9 (reflecting that Defendant took issue with McCray claiming his full $1,500 fee on days he allegedly failed to work eight hours)). Defendant highlights that the Agreement pertains to a "rate" of pay and does not say that Plaintiff "will be compensated $1,500 each day *irrespective of the time allocated to perform the work*." (Dkt. 53 at 6). OmniSpeech thus interprets the payment term as implying a pro-rata billing scheme, through which McCray would only be paid for the number of hours he actually worked on a given eight-hour day. (Dkt. 53 at 6–7; *cf.* Dkt. 55 ¶ 14 (explaining OmniSpeech's belief that McCray would "prorate his time for work performed less than an eight-hour day")).

However, OmniSpeech's interpretation is at odds with the plain language of the Agreement. For this proposed reading to come within the contract's four corners, the Agreement would require additional, qualifying language regarding the payment plan. For example, nothing in the Agreement obligates McCray to bill in increments of any kind aside from "per day." Yet

---

[1] The parties submit extrinsic evidence to aid in deciphering the payment provision and the parties' intent. Because the Agreement's language is clear, the words within its four corners suffice to resolve this dispute. *Camico Mut. Ins. Co.*, 474 F.3d at 992–93; *see also Empress Casino*, 68 N.E.3d at 869.

OmniSpeech could have negotiated a system that expressly required McCray to bill by the hour or half-hour, or otherwise prorate his time. The contract might also have explicitly defined a "day" as an eight-hour shift if this was the OmniSpeech's expectation as to McCray's work schedule. But it did not, and there is no other limiting language concerning the "rate of 1,500 per day" term. Note that there is a "strong presumption against provisions that easily could have been included in the contract but were not." *West Bend Mutual Ins. Co. v. Krishna Schaumburg Tan., Inc.*, 166 N.E.3d 818, 827 (Ill. App. Ct. 1st Dist. 2020) (citing *Wright v. Chi. Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct. 1st Dist. 1990)). OmniSpeech had an opportunity to negotiate and amend the terms of the Agreement, and in fact *did* take opportunity. (Dkt. 55-1 at 2–3). Espy-Wilson provided edits to a draft contract offered by McCray prior to signing, but did not insert more specific terms concerning McCray's rate of pay. (Dkt. 55-1 at 2–3 (showing Espy-Wilson's October 15, 2015 email stating "I made one edit to the consultancy agreement . . . . If you are okay with everything, we can execute the agreement")). As it stands, OmniSpeech's reading of the contract urges the Court to add language that is simply not there, which cannot be done. *See, e.g.*, *Sheehy*, 702 N.E.2d at 204. *See also Highland Supply Corp. v. Ill. Power Co.*, 973 N.E.2d 551, 559 (Ill. App. Ct. 5th Dist. 2012) (citing *Resolution Trust Corp. v. Holtzman*, 618 N.E.2d 418, 423 (Ill. App. Ct. 1st Dist. 1993)) (explaining that a court cannot rewrite a contract to "provide a better bargain to suit one of the parties" where the contract terms are otherwise clear and unambiguous). Under these circumstances, the contract can only be read as providing for a day rate of pay.

OmniSpeech also argues that the Court should deny McCray's motion because McCray "precluded OmniSpeech's ability to perform pursuant to the terms of the contract, and otherwise made performance impossible." (Dkt. 53 at 11). In particular, OmniSpeech asserts that Plaintiff

failed to "submit invoices and/or documents requested by OmniSpeech reflecting the work he purportedly performed on behalf of the Company." (*Id.*). This argument is rooted in the Defendant's belief that Plaintiff should have prorated his hours and worked eight-hour days to receive his full fee. (*Id.* at 11–12 n.6 (disputing McCray's claim that he truly worked eight-hour days)). However, as already discussed, the Agreement plainly called on McCray to bill *daily* and not in hour-by-hour or minute-by-minute increments. The Agreement also required McCray to "provide invoices to OmniSpeech at the end of each month," (Dkt. 51-5), which McCray did. (Dkt. 61-1 at 35:3–23). McCray's monthly invoices also included short descriptions of the work he performed for any given day he billed for. (*E.g.*, Dkt. 54-2; Dkt. 61-2 at 47:18–24 ("Q. Mr. McCray sent you a monthly bill each month right? A. Yes. Q. And so in October of 2015 you received an invoice . . . that lists out the work he did right? A. Yes."). In light of these facts, McCray's provision of daily time logs cannot be said to have impeded OmniSpeech's ability to perform (namely, compensate McCray) under the contract.

In summary, the plain language of the Agreement is clear and unambiguous. Giving the disputed language its plain and ordinary meaning, the Agreement requires OmniSpeech to compensate McCray $1,500 for each day he worked. The Agreement imposes no requirement for McCray to bill at any rate, or in any increments of time other then "per day."

**B.    Extension of the Contract's Effective End Date**

OmniSpeech next argues that McCray's motion should be denied, in whole or in part, because the term of the executed contract ended on December 15, 2015. (Dkt. 53 at 12). OmniSpeech refers to the following provision in the Agreement:

> Greg McCray will operate as a Consultant supporting OmniSpeech from October 12, 2015 through December 31, 2015. By mutual agreement, the time frame of this Consultancy Agreement may be extended beyond December 31, 2015.

(Dkt. 48-1 at 1). Defendant's position is that because the parties "did not (at any point) reach an agreement as to an essential term in the contract (payment), there was no mutual assent to extend the contract." (Dkt. 53 at 2). OmniSpeech claims that it rejected McCray's "alleged interpretation of the payment term" and "never agreed to pay McCray $1,500 each day." (*Id.* at 12–13). Defendant concludes that because there was no meeting of the minds on this essential term of the agreement, the contract could not have been extended. (*Id.* at 12). Alternatively, OmniSpeech argues that Plaintiff's motion should be denied "as to any work performed after December 31, 2015" because the parties never agreed on an extension of the contract term past that date. (*Id.* at 13 n.7). Plaintiff rebuts that the Agreement "was modified by conduct to the limited extent that it was extended beyond December 31, 2015." (Dkt. 54 at 13).

From the outset, OmniSpeech's claim that it "never agreed to pay McCray $1,500 each day" is unfounded. The executed Agreement clearly and unambiguously requires OmniSpeech to compensate Plaintiff at that daily rate, and OmniSpeech is bound by the terms of the Agreement. The assertion that OmniSpeech rejected McCray's interpretation of the fee arrangement lacks evidentiary support. The record reflects that OmniSpeech objected to McCray's billing practices on only one occasion. (Dkt. 51-6 at 3). In an email dated March 14, 2016 – months after the Agreement's December 31, 2015 end date – Espy-Wilson objected to McCray's billing a full day on December 8, 2015, and "many others where it seems [he] would have [worked] less than 8 hours." (*Id.*). Espy-Wilson's email did not specify any other dates besides December 8, 2015 that she believed were billed improperly. (*Id.*). She requested that McCray "prorate [his] time" on days he works fewer than eight hours. (*Id.*).

McCray rejected Espy-Wilson's request within two hours, asserting the plain terms of the Agreement. He wrote: "I am following the Agreement that we signed that was set to a day rate as

opposed to an hourly rate." (Dkt. 55-4 at 1). He also explained that he worked a full day on December 8, 2015 and often worked longer hours than his invoices reflect. (*Id.*). McCray continued billing a day rate for his services through at least December 2016 following this exchange. (*See generally* Dkt. 55-2). Critically, the record is devoid of evidence that Espy-Wilson *ever* objected to McCray's billing practices or disputed the Agreement's fee structure outside of her March 14, 2016 email. Instead, Espy-Wilson's deposition testimony reveals that she has no recollection of disputing any particular invoice – whether verbally or via email – from October 2015 through December 2016, again with the exception of her March 14, 2016 email. (Dkt. 51-2 at 110:12–111:9 (conceding Espy-Wilson does not recall disputing McCray's October 2015 invoice beyond her March 14, 2016 email); 111:12–112:4 (same as to November 2015 invoice); 112:5–114:2 (same as to December 2015 invoice); 114:3–22 (same as to January 2016 invoice); 114:23–115:6 (same as to February 2016 invoice); 115:7–21 (same as to March 2016 invoice); 115:22–116:17 (same as to April 2016 invoice); 116:17–117:18 (same as to May 2016 invoice); 117:19–118:13 (same as to June 2016 invoice); 118:14–119:11 (same as to July 2016 invoice); 119:12–120:4 (same as to August 2016 invoice); 120:5–121:6 (same as to September 2016); 121:7–122:20 (same as to October 2016 invoice); 122:21–123:15 (same as to November 2016 invoice); 123:16–124:7 (same as to December 2016 invoice)).

In sum, OmniSpeech provides evidence of only one time it objected to McCray's invoices. McCray informed OmniSpeech that he read the Agreement to require invoicing at the rate of $1,500 per day. OmniSpeech's conduct thereafter demonstrates that it accepted his "by the day" invoicing, having continued to accept his work for nearly a full year afterward. (*See also id.* at 200:22–201:3 ("Q. My question is you knew in March at least, that [McCray] understood [his billing rate] to be $1,500.00 a day [for each day he worked, not prorated,] and in spite of that you

kept him working for nine months[,] is that true?  A. Yes.")).  This pattern of conduct undermines OmniSpeech's claim that it rejected McCray's "alleged interpretation of the payment term."

As to whether the contract extended beyond December 31, 2015 more generally, Plaintiff again has the better of this argument.  A contract modification is a change in one or more respects which introduces new elements into the details of the contract and cancels others, but leaves the contract's general purpose and effect undisturbed.  *See, e.g.*, *Household Fin. Servs., Inc. v. Coastal Mortg. Servs., Inc.*, 152 F.Supp.2d 1015, 1022 (N.D. Ill. 2001) (citing *Int'l Bus. Lists, Inc. v. AT&T Co.*, 147 F.3d 636, 641 (7th Cir. 1998)).  "A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct."  *Int'l Bus. Lists*, 147 F.3d at 641 (citing *Maher & Assocs., Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1007 (Ill. App. Ct. 2d Dist. 1994)); *see also U.S. for Spec. Erectors, Inc. v. Wil–Freds Constr., Inc.*, No. 96-cv-2915, 1997 WL 11041, at *3 (N.D. Ill. Jan. 7, 1997).  The existence of a modification, as well as its terms, conditions, and the intent of the parties, are questions of fact that typically must be determined by the trier of fact.  *See, e.g.*, *Freiburger v. Timmerman*, No. 13-cv-8174, 2016 WL 4493448, at *18 (N.D. Ill. Aug. 26, 2016); *Household Fin. Servs.*, 152 F.Supp.2d at 1022; ("Whether the terms of a written contract are modified by acts or conduct is a question of fact for the trier of fact."); *Janda v. U.S. Cellular Corp.*, 961 N.E.2d 425, 437 (Ill. App. Ct. 1st Dist. 2011) ("Generally, when evidence is introduced to show a modification of a written contract or a waiver of a provision of the contract, the determination of the final agreement between the parties is a question of fact to be determined by the fact finder.").  "However, if after the consideration of the extrinsic evidence, the court determines that reasonable men could only reach one conclusion [as to whether and how a written contract was orally modified], the issue can be

12

decided by the court as a matter of law." *Janda v. U.S. Cellular Corp.*, 961 N.E.2d at 437 (citing *E.A. Cox Co. v. Road Savers Int'l Corp.*, 648 N.E.2d 271, 277–78 (Ill. App. Ct. 1st Dist. 1995)).

The record is rife with evidence that McCray continued to provide services to OmniSpeech beyond December 31, 2015. (*See, e.g.*, Dkt. 54-2 at 1–26). In turn, OmniSpeech clearly – and admittedly – accepted McCray's services throughout 2016. (Dkt. 54-2 at 200:22–201:3 (Espy-Wilson acknowledging that she "kept McCray working" throughout 2016)). As recently as December 2016, McCray was still involved in discussions with OmniSpeech's contract attorney, was present for an OmniSpeech strategy call, and engaged in conversations and negotiations with OmniSpeech's investors. (Dkt. 54-2 at 2–3). Espy-Wilson conceded in her deposition that she continued to accept McCray's services after receiving his monthly invoices in 2016, including *after* objecting to his billing practices in March 2016. (*E.g.*, Dkt. 51-2 at 118:8–13 (Q. And you never complained to Mr. McCray about paying this [June 2016] bill[,] did you? A. I don't recall. Q. And you continued to accept work from Mr. McCray after this [June 2016] bill[,] right? A. Yes."); *id.* at 116:9–16; 117:16–18; 119:9–11; 119:23–120:4; 120:24–121:2). OmniSpeech also paid portions of McCray's fees between the months of April and August 2016. (Dkt. 54-2 (showing a chart indicating that OmniSpeech paid McCray $22,500 in 2016). Conversely, the Defendant adduces no evidence that it ordered McCray to cease his OmniSpeech-related activities at any time. On this record, a reasonable factfinder could reach only one conclusion: that McCray and OmniSpeech's course of conduct modified the Agreement to the limited extent that the parties extended McCray's employment term past December 2015. *See, e.g.*, *Daniel v. Ripoli*, No. 1-12-2607, 2016 WL 6823424, at *16 (Ill. App. Ct. 1st Dist. Nov. 16, 2016) (reversing summary judgment, finding that a party acquiesced to a modified agreement where he continued to receive and accept monetary benefits under the modified agreement even after his own proposed

13

modifications were not agreed to); *cf. Spectrum Sys., Inc., v. Eng*, 2010 WL 3526520, at *8 (N.D. Ill. 2010) (granting summary judgment where the parties acquiesced to the modified terms of a contract and "acted thereafter as if it governed their relationship until the time of [the employee's] departure from the company").

## **CONCLUSION**

Plaintiff McCray's motion for summary judgment [46] is granted.

Virginia M. Kendall
United States District Judge

Date: September 30, 2021